# 𝔖taunton

ANNIE MCNELIS, MARY MOORE AND JAMES J. BOYLE V. COLONIAL-AMERICAN NATIONAL BANK, EXECUTOR OF C. M. MCNELIS, DEC'D, ET ALS.

September 20, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Chinn, JJ.

The opinion states the case.

*John Strickler* and *Charles M. Broun,* for the appellants.

*Woods, Chitwood, Coxe & Rogers, Martin & Abbott* and *Hall, Buford & Leftwich,* for the appellees.

EPES, J., delivered the opinion of the court.

Cornelius M. McNelis, who commonly signed his name C. M. McNelis, died June 11, 1931, leaving a will which is dated August 19, 1930. The provisions of his will are given in the footnote.[1] We shall hereafter speak of him as C. M. McNelis.

---

[1] Omitting some immaterial provisions he devised as follows:

(2) He devises to his widow, Mary McNelis, for her life, "in lieu of her dower," one-third of his real estate.

(3) To his sister, Annie McNelis, he devises for her lifetime one-third of his real estate.

(4) "Upon the death of my wife, Mary McNelis, I devise a one-third undivided interest in my real estate to the Rt. Rev. Andrew J. Brennan, Catholic Bishop of Virginia, or his successor as such, and upon the death of my sister, Annie McNelis, I devise a one-third undivided interest in my real estate to the said Rt. Rev. Andrew J. Brennan, Catholic Bishop of Virginia, or his successor as such, to serve as a memorial to my late brother, James McNelis, and to be· used preferably for the founding of a Catholic High School in Roanoke, Virginia, but in the event that the Rt. Rev. Andrew J. Brennan, Catholic Bishop of Virginia, or his successor as such, deems it inexpedient to use this devise for the above named purpose, the same

.The will was duly probated, and Colonial-American National Bank qualified as executor of the estate. In January, 1932, the executor filed its bill in chancery for the settlement of the estate, making all the devisees and legatees parties.

In the course of the proceedings the executor, widow and Burrell Memorial Hospital made claim that the three items of intangible personal property, below mentioned, which are now in the possession of the several persons below named, are the property of the estate of C. M. McNelis and not the property of the persons who have possession of them:

(1) A note for $18,000, dated November 22, 1927, drawn by Cornelius M. McNelis and Mary McNelis, payable ten years after date, at Colonial National Bank of Roanoke, Virginia, "to Legal Holder or order," with in-

shall be used for the benefit of St. Vincent's Orphanage in the city of Roanoke, Virginia."

(5) He devises to his sister, Mrs. Bridget Boyle, for her life, one-third of his real estate, with remainder to her children.

(6) To his niece, Mary Moore, he bequeaths twenty-five shares of his stock in the Colonial-American National Bank of Roanoke, Virginia, and gives to his nephew, Cornelius Boyle, his gold watch and tie stick pin.

(7) He bequeaths to his wife, Mary McNelis, all his household furniture and one-third "of the residue of my personal property, tangible and intangible, in lieu of her distributive share in my personal property."

(8) "From the residue of my personal estate I make the following bequests, towit:" (a) To P. D. Branagan of Roanoke, $500; (b) to N. W. Keeney, $500; (c) to Sister Mary Frances Byrne, or if she predecease him, to Visitation Convent, Wytheville, Va., $500; (d) to P. C. Gallagher, $500. He, however, provides that if any of the legatees mentioned in this section predecease him, the gift to such legatee shall lapse.

(9) He bequeaths $300 to the pastor of "St. Andrew's Church," and $300 to the pastor of the church of "Our Lady of Nazareth," "for masses for my brother James M. McNelis and myself."

(10) To Colonial-American National Bank, as trustee for Burrell Memorial Hospital he bequeaths $5,000 as a memorial to James M. McNelis, "to be used by said hospital for the treatment of poor and indigent patients."

(11) "All the rest and residue of my personal property, if any," he gives to the children of his sister, Bridget Boyle.

(12) He nominates Colonial-American National Bank of Roanoke as his executor and empowers it "to renew any loans upon any of my real estate if my executor deems it wise to do so."

terest at six per centum per annum, payable semi-annually. On the margin of the face of this note are now written the following words, "Legal Holder Annie McNelis."

On the back of the note are the following entries:

"Int. Pd. to
"May 22, 1929 .............$540
"Nov. 22, 1929 .............. 540
"May 22, 1930 .............. 540
"Nov. 22, 1930 .............. 540
"May 22, 1931 .............. 540
"Nov. 22, 1931 .............. 540."

This note is in the possession of Miss Annie McNelis, who claims that she became the legal holder thereof about May 22, 1929.

(2) A note for $1,000, dated September 15, 1928, drawn by Central Manufacturing Company, payable three years after date, with "interest at six per centum per annum," at Colonial National Bank of Roanoke, to "bearer or order." On the back of this note, in what we understand is admitted to be the handwriting of C. M. McNelis, is this endorsement:

"Pay to
"Mary A. Moore
"C. M. McNelis."

This note is in the possession of Miss Mary Moore, who claims to have become the legal holder thereof by gift from C. M. McNelis about eight months before his death.

(3) A certificate of deposit, dated January 15, 1931, issued by the Colonial-American National Bank of Roanoke, which reads in part as follows:

"This is to certify that Jas. J. Boyle by C. M. McNelis has deposited in this bank exactly $500 & 00 cts. payable to the order of Jas. J. Boyle by C. M. McNelis on the return of this certificate properly endorsed. * * * With interest at three per cent per annum if left three months.

With interest at four per cent per annum if left six months."

This certificate is in the possession of Miss Mary Moore, but she and James J. Boyle testify that it was given to James J. Boyle by C. M. McNelis in January, 1931, and is held by Miss Moore as Boyle's property.

The widow, Mary McNelis, and the Burrell Memorial Hospital appeared by counsel and joined with the executor in vigorously contesting the claims of Annie McNelis, Mary Moore and James J. Boyle, to the above mentioned notes and certificate of deposit. None of the other devisees or legatees (other than the appellants) made an appearance.

The court referred the cause to H. M. Moomaw, one of the commissioners in chancery, with directions to him to inquire and report, among other things, whether these two notes and the certificate of deposit are the property of the estate or of the claimants.

The commissioner, after taking voluminous evidence on the subject, which is returned with his report, reported that the two notes and the certificate of deposit were the property of the estate of C. M. McNelis.

In addition to these two notes and this certificate, the commissioner reported that the estate of C. M. McNelis consisted of the personal property and real estate, which with the value thereof as reported by him, is listed in footnote.[2]

---

[2] Cash in hands of executor.................$ 2,511.65
 Notes of John and Maria Lewis............ 2,160.00
 and of Clyde C. Davies.................. 4,035.00
 85 shares Colonial-American Bank stock.... 17,000.00
 Automobile ............................. 200.00
 Furniture and household effects ........... · 500.00
 Certificate of deposit dated Nov. 25, 1930.. 500.00
 ----------
 Total..............................$ 24,746.65

| | | VALUE | |
|---|---|---|---|
| | | Fee Simple | Annual Rental |
| 1. | Residence property, lots 11, 12, 13 Grove Park ..............................$ | 8,000 | $ 540 |
| 2. | Parts of lots 26, 27 and 28, section 3, Grove Park ..................... | 1,500 | None |

Parcel 4 is subject to a mortgage of $16,000 and parcel 5 is also subject to a mortgage of $16,000. These mortgages, securing different debts, were placed on these properties by the heirs of J. M. McNelis, and as between the heirs C. M. McNelis is liable for two-fifths ($6,400) of each.

Commissioner Moomaw further reported that, including two-fifths of the above mortgages, the indebtedness of the estate amounted to $17,547.20.[3]

By its decree entered November 1, 1932, the court overruled the exceptions of Annie McNelis, Mary Moore and James J. Boyle to the commissioner's report and affirmed it, saying: The court is of opinion "that the report of Commissioner Moomaw is a sound conclusion based on the application of correct principles of law to a careful and well considered finding of the facts established by the testimony and exhibits." By this decree the court ordered Annie McNelis to "assign and deliver" the $18,000 note to the executor, Mary Moore to "assign and deliver" the $1,000 note to the executor, and James J. Boyle to "deliver or cause to be delivered" to the executor the $500 certificate of deposit. From this decree an appeal has been allowed to Annie McNelis, Mary Moore and James Boyle.

Upon an examination of the evidence we are of opinion that the court erred in confirming the report of the com-

| | | | |
|---|---|---:|---:|
| 3. | Lot 30, section 1, Northside Add., and house .........................$ | 800 | $ 120 |
| 4. | ⅖ interest in 106-8 Church Ave. with 2 brick mercantile houses thereon (value ⅖ interest) ............. | 24,000 | 2,400 |
| 5. | ⅖ interest in No. 203 Nelson St., with brick mercantile building thereon (value ⅖ interest) ............. | 11,000 | 720 |
| 6. | S. E. cor. Norfolk (Railroad) Ave. and Nelson St. (value ⅖ interest).... | 1,200 | 144 |
| 7. | ½ interest in lots 9-16, section 38, Riverview ...................... | 1,140 | ........ |
| | Total.........................$ | 47,640 | $ 3,924 |

[3] This includes a bill for $2,181.50 filed by John M. Oakey, Inc., morticians, for "casket and services $2,000," metal vault $125, embalming $25, hearse $12.50, opening grave $15, and door spray $4, which is noted "ordered by Mrs. C. M. McNelis."

missioner in so far as it relates to the ownership of these items. The commissioner should have reported, and the court should have decreed that the $18,000 is the property of Annie McNelis, that the $1,000 is the property of Mary Moore, and that the $500 certificate of deposit is the property of James J. Boyle.

To correctly appreciate, interpret and evaluate the evidence bearing more directly upon the questions at issue, it is important, we think, to get a view of the background against which it is projected, as that background is disclosed to our view by the evidence, and particularly of the relation C. M. McNelis bore to Annie McNelis.

C. M. McNelis had two brothers and three sisters—James, John, Annie, Mrs. Bridget Boyle and Mrs. Moore. James, the oldest brother, who never married, was the head of the family, or certainly of those members of it who lived in Roanoke. He died intestate in August, 1927, worth approximately $152,500. John, a widower, lived in Ireland where he died in June, 1929, leaving a will devising all his property to C. M. McNelis. Miss Annie has never married. Mrs. Moore died years ago leaving two children, Mary Moore (one of the appellants) and Mrs. Margaret Nunan. Mrs. Bridget Boyle lives in Wilkes-Barre, Pennsylvania. She has eight children, among them James J. Boyle (one of the appellants) and Mrs. Annie Halloran.

C. M. McNelis did not marry until 1924. From 1903 until in 1924 James McNelis, C. M. McNelis and their sister Annie lived together in James' home in Roanoke, Virginia, which, for the latter part of this period, was at 1715 Patterson avenue. For years their niece, Mary Moore, lived with them. When C. M. McNelis married he moved to his own home on Grove avenue. Thereafter James and Annie McNelis and Mary Moore lived together in James' home until his death. From 1903 until James' death he ran the home and Miss Annie kept house for him. After James' death his other heirs conveyed their interest in his home place to Annie McNelis and Mary Moore; and they have continued to live there.

The record does not show Annie McNelis' age, but the fair inference from it is that she is well advanced in life. It is silent with reference to her prior to 1903, but since that time her life has been spent in keeping house for her brothers. No evidence tends to show that she ever had any other occupation, or engaged in business on her own account. She has never known and knows little about business or about her own financial affairs. Having implicit confidence in her brother, C. M. McNelis, she turned over to him whatever she had, left him to manage her affairs as he deemed proper, and unquestioningly accepted his statement as to what he had in his hands belonging to her or owed her. He kept most, if not all, of her papers for her. There is nothing in the record which tends to show that during his lifetime she kept in her personal possession any paper relating to her business affairs. The evidence conclusively shows that C. M. McNelis acted as her general agent in the management of her affairs, and that, with her acquiescence and in accordance with her desires, he had come to be practically her *alter ego* in the handling of them. This appears from the uncontradicted testimony of Annie McNelis, which on this point is fully corroborated by the testimony of Mary Moore, and also finds corroboration in the testimony of D. P. Hylton, the trust officer of Colonial-American National Bank, as well as in other evidence.

This relationship between a trusted male member of a family and his mother, sister or wife is so familar to Virginians that it is unnecessary to comment upon it here. It constitutes an agency which is very closely kin to a trusteeship.

In the fall of 1930 C. M. McNelis' health became bad. From this time until his death Mary Moore looked after Miss Annie's business to some extent, and since his death she has occupied practically the same relationship to her aunt Annie that he had heretofore occupied.

When James McNelis died he left seventy-five shares of stock of the Colonial National Bank (now the Colonial-American National Bank) appraised at $15,000, his house-

hold furniture, an automobile, and eleven parcels of real estate situate in Roanoke city. His real estate was appraised in September, 1927, at the aggregate value of $136,750. We have designated the several parcels of his real estate by letters and give a brief description of each and of the improvements thereon at the time of his death in the footnote.[4] We shall hereafter refer to these parcels of real estate as parcel A, parcel B, etc.

The commissioner seems to have been of the opinion that the evidence fails to show that it was probable that any substantial amount of money could have been owing by C. M. McNelis to Annie McNelis in May, 1929. In this view we do not concur.

James' heirs and their proportionate interests in his estate were as follows: Annie McNelis, C. M. McNelis, John McNelis and Bridget Boyle each inherited one-fifth. Mary Moore and Margaret Nunan each inherited one-tenth.

C. M. McNelis qualified as the administrator of James' estate. He also took charge for himself and his coheirs of the management of James' real estate, and had practically complete charge thereof. He rented it out, collected the rents, and paid the taxes and insurance thereon.

In May, 1928, the heirs put a ten-year mortgage for $16,000 on parcel D, and in September, 1928, another ten-

---

[4] Real estate of which James McNelis died seized and values thereof as appraised September 20, 1927:

| | | |
|---|---|---:|
| (A) | No. 32 Gilmer St., N. E., frame dwelling | $ 2,000 |
| (B) | No. 22 Gilmer St., N. E., frame dwelling | 2,500 |
| (C) | ½ interest in a lot on 7th Ave., N. W., frame cottage standing in names of J. M. & C. M. McNelis (½ int.) | 750 |
| (D) | No. 106-8 Church Ave., brick mercantile building | 50,000 |
| (E) | No. 303 Nelson St., brick mercantile building | 27,500 |
| (F) | S. E. Cor. Norfolk (Railroad) Ave. & Nelson St., brick mercantile building | 13,500 |
| (G) | No. 109 Church Ave., brick mercantile building | 15,000 |
| (H) | No. 9 Norfolk (Railroad) Ave., frame building | 3,500 |
| (I) | 106-8 High St., 2 frame cottages | 2,500 |
| (J) | ½ interest in lots 9-16, sec. 38, Riverview Ave., standing in names of J. M. & C. M. McNelis (½ int.) | 1,500 |
| (K) | No. 1715 Patterson Ave., brick dwelling | 18,000 |
| | | $ 136,750 |

year mortgage for $16,000 on parcel E. Each bears interest at five and one-half per cent per annum payable semi-annually. As between themselves the heirs are bound for the payment of these mortgages in the same proportion as they are interested in these properties by inheritance. The fair inference from the evidence is that these mortgages were negotiated and used for the purpose of making improvements on parcels D and E, and that C. M. McNelis handled the whole matter. After these mortgages were executed he paid the interest thereon from the rents of these properties.

On July 19, 1928, the heirs sold and conveyed to John and Maria Lewis parcel A. The deferred payments (aggregating $4,150) of the purchase price were evidenced by 166 notes for $25 each, drawn payable to "C. M. McNelis, Administrator," one each month beginning August, 1928. On July 14, 1928, they sold parcel B to Clyde and Dorothy Davies. The deferred installments (aggregating $5,500) of the purchase money were evidenced by 183 notes for $30 and one note for $10, drawn payable to "C. M. McNelis, Administrator," one each month beginning August, 1929. On August 1, 1928, C. M. McNelis and the heirs of J. M. McNelis sold and conveyed to Carter Kyle parcel C. The deferred payments (aggregating $3,640) of the purchase money were evidenced by 130 notes for $28 each, payable one each month, beginning September 1, 1928. One-half of the Kyle notes belonged to the heirs of J. M. McNelis. All these notes were held by C. M. McNelis, and all of them which were collected prior to his death were collected by him. The fair inference from the record is that on May 22, 1929, C. M. McNelis had collected ten of the Lewis notes, ten of the Davies notes, and nine of the Kyle notes.

The record affirmatively shows that C. M. McNelis rented parcels D, E, and F and collected the rent therefor. It is silent as to whether he rented any other parcel. But from the nature of the improvements thereon it would appear not improbable that he also rented parcels G and H and collected the rent thereon. There is no evidence to show

what became of I (106-8 High street) which had two frame dwellings thereon, except that it is not reported by the commissioner as a property in which C. M. McNelis owned an interest at his death. Perhaps it was sold, as were parcels A, B and C; but it would appear to be not improbable that unless, or until, it was sold C. M. McNelis also rented it and collected the rent thereon.

There is no evidence as to the amount of rent received by C. M. McNelis for parcels D, E and F in 1927 and 1928. But on May 22, 1931, C. M. McNelis filed his report as executor of John McNelis. From this report it appears that C. M. McNelis received from June 27, 1929, to the date of that report $10,000 for rent on parcel D and $4,850 for rent on parcel E; that he was paying the taxes and the interest on the mortgages on these properties out of the rents; that the taxes paid, or accrued, on these properties during that period (approximately two years) amounted to $1,700; and that the net one-fifth interest of John's estate in the rent of these two properties for this period was $2,198. (John had sold his interest in parcel F by deed dated April 22, 1929, and therefore no mention is made in this report of rent for that parcel.)

C. M. McNelis signed and filed in 1930 his State income tax return for the calendar year 1929.[5] In it he lists income from the estate of J. M. McNelis $800, evidently meaning his one-fifth of the real estate after deducting one-fifth of the taxes, interest and insurance. In May, 1931, Mary Moore as the agent of C. M. McNelis signed and filed his income tax return for the year 1930. In it the total rents received by him in the calendar year 1930 for parcels D, E and F of J. M. McNelis' land are given as follows: Parcel D $6,000, parcel E $3,000, parcel F $750. D. P.

---

[5] The record shows that copies of the income tax returns of C. M. McNelis filed in 1930 and 1931 were before the commissioner, but they were not included in the exhibits sent up to us. For our convenience instead of requiring them to be sent up, we have examined the originals in the State Department of Taxation. According to a statement in the record made by counsel for Annie McNelis, the Department of Taxation advised him that they had no record of an income tax return made by C. M. McNelis for the calendar year 1928.

Hylton, trust officer of the executor, testified that when C. M. McNelis died all three properties were rented out. He does not give the rent for parcel D, but states that parcel E was rented for $250 per month and parcel F for $80 per month.

By deeds dated April 22, 1929, recorded May 12, 1929, the following conveyances were made:

Annie McNelis conveyed to Mary Moore her interest in parcel H for $700, and to C. M. McNelis her interest in parcel F for $2,700. C. M. McNelis conveyed to Annie McNelis his interest in parcel G for $3,000.[6] There is no direct evidence as to how the settlements for these conveyances were made; but the fair inference from the evidence is that the matter was handled by C. M. McNelis for his sister Annie. If this be true, in the settlements for these conveyances $400 should have come into the hands of C. M. McNelis at this time for the account of his sister.

By deed dated October 28, 1927, recorded August 30, 1928, C. M. McNelis and wife, John McNelis, Bridget Boyle and husband, and Margaret Nunan and husband, for five dollars and natural love and affection, conveyed to "Annie McNelis and Mary Moore" all the interest of the grantors in James M. McNelis' home property, 1715 Patterson avenue (parcel K).

The following writing signed by C. M. McNelis, "C. M. McNelis, attorney in fact for John McNelis," Bridget Boyle and John J. Boyle, and Margaret Nunan and Frank Nunan, was delivered to Annie McNelis and Mary Moore:

"We the undersigned, hereby agree to assign our interest in the household goods and National touring car * * * of the estate of J. M. McNelis, deceased, to Annie McNelis and Mary Moore; we also assign to them our interest in the Colonial National Bank stock."

This writing is not dated, but other evidence almost com-

---

[6] These conveyances and conveyance of the same date from C. M. McNelis and John McNelis to Mary Moore of their interest in parcel G, explain why no mention of the rent of parcel G is made in C. M. McNelis' tax return for the calendar year 1930.

pels the inference that it was executed and delivered between September 21 and November 25, 1928.

Mary Moore's testimony with reference to this conveyance and assignment is this: "A few weeks after my uncle's death, my aunt, Mrs. John Boyle, realizing that if Uncle James' death had not been so very sudden and he had been given a chance to make a will that Aunt Annie and myself would have received the greater part of his estate, suggested that the heirs turn over their interests in the home, furniture, automobile, bank stock and all other personal property to Aunt Annie and myself. Aunt Annie consented to this only on condition that I be given half interest with her."

But the way in which C. M. McNelis handled the bank stock of James M. McNelis, as shown by the bank's records, is not consistent with an understanding by him that the heirs of J. M. McNelis assigned their interest in this stock to Annie McNelis and Mary Moore equally.[7] It is more consonant with the view that Mary Moore was to take only her sister's, Margaret Nunan's, one-tenth interest, which (with her own interest) would have given her one-fifth of

---

[7] The bank's records show the following transfers of the J. M. McNelis 75 shares of stock:

Nov. 25, 1928, transferred from "J. M. McNelis to C. M. McNelis, trustee of Annie McNelis".......40 shares

Nov. 28, 1928, transferred from "J. M. McNelis" to "C. M. McNelis" .............................20 shares

Nov. 28, 1929, transferred from "J. M. McNelis" to "Mary Moore" ..............................15 shares

Dec. 28, 1929, transferred from "C. M. McNelis, trustee of Annie McNelis" to "C. M. McNelis"......30 shares

Dec. 28, 1929, transferred from "Mary Moore" to "C. M. McNelis" .............................15 shares

Dec. 28, 1929, new certificate issued to "C. M. McNelis, trustee for Annie McNelis" for part of the stock evidenced by the certificate of Nov. 25, 1928 ..................................10 shares

At the time of his death C. M. McNelis held certificates issued to "C. M. McNelis" for all the stock formerly held by J. M. McNelis, except the ten shares evidenced by the certificate of Dec. 28, 1929, issued to "C. M. McNelis, trustee of Annie McNelis." Since C. M. McNelis' death the bank has transferred this last mentioned ten shares to Annie McNelis in her own name.

the stock, or fifteen shares. This is the amount that was transferred to her. Mary Moore does not claim to have sold C. M. McNelis any bank stock on or about November 28, 1928. The only stock she claims to have sold him was in connection with a transaction that took place between October 8, 1929, and January 15, 1930. Annie McNelis testifies that she sold her brother C. M. McNelis some bank stock which she got from her brother James' estate, but does not remember when she sold it to him, how much it was, what he paid her for it, or whether she now owns any stock in the "Colonial Bank" or not. She says in this connection, "I can't remember. They tell me something and I forget. I never took any interest in money matters. I depended on them."

On November 28, 1928, C. M. McNelis had twenty shares of the J. M. McNelis stock transferred to "C. M. McNelis." This fact considered in connection with the other transfers of J. M. McNelis' stock is indicative that he then considered himself as having purchased these twenty shares either from the estate or from Annie McNelis.

The evidence is not sufficient to prove as a fact that C. M. McNelis purchased from himself as agent for Annie McNelis these twenty shares of the J. M. McNelis stock; but when all the evidence is considered, there is much which points to his having considered himself as having done so.[8]

When James McNelis' estate was appraised in 1927 this

---

[8] By deed dated October 8, 1929, recorded November 12, 1929, Margaret Nunan conveyed to Annie McNelis her one-tenth interest in parcel D. for $7,400 in cash and the assumption by Annie McNelis of one-tenth of the $16,000 mortgage on that property. On January 15, 1930, C. M. McNelis paid to Mary Moore for Annie McNelis the purchase price mentioned in this deed. In connection with this transaction Annie McNelis turned over to C. M. McNelis thirty shares of the stock in the Colonial National Bank which had come to her from J. M. McNelis' estate. Mary Moore testified that Miss Annie turned over to C. M. McNelis *all* the stock which she received from James McNelis' estate. But she is evidently talking about the stock which was at that time held by Annie McNelis, and had no reference to the twenty shares which were transferred to C. M. McNelis on November 28, 1929. She also seems to have been mistaken about her Aunt Annie having turned over all the stock which she then owned. Only thirty of her forty shares were transferred to C. M. McNelis. (See note 7 for history of these stock transfers.)

stock was valued at $200 per share. When C. M. McNelis' estate was appraised in 1931 it was valued at $200 per share, and that is what Commissioner Moomaw reports it is worth in 1932. From whomever he purchased the twenty shares on or about November 28, 1928, the fair inference is that he paid or considered himself obligated to pay approximately $200 per share, or about $4,000 for it.

Whatever may be the facts with reference to the acquisition by C. M. McNelis of this bank stock, from September, 1927, until November 25, 1928, he had under his management and control seventy-five shares of this stock, an one-fifth interest in which belonged to Miss Annie, and from November 25, 1928, until more than six months after May, 1929, he held forty shares of this stock, issued to himself as trustee for her.

The record does not show what, if any, dividends were paid on this stock during these periods; but to say the least, it is not improbable that some money belonging to Annie McNelis came into his hands from this source prior to May 22, 1929.

In reply to questions intended to ascertain from her, if possible, the sources from which any money that was owed her by C. M. McNelis on or about May 22, 1929, could have come, Annie McNelis testified as follows: "My brothers were both very good to me. My oldest brother [James] gave me money. In 1904 he offered me property and I told him I didn't want it. He gave me money right along, and this youngest brother [C. M. McNelis] took it and used it. He borrowed from me." At another place she says: "He [C. M. McNelis] came to my house in 1903. I boarded and roomed him and his laundry was taken care of by me. I kept no record of it but he did." In reply to the question whether C. M. McNelis had given her any notes (prior to May, 1929) to represent what he owed her, she replied: "I don't remember. He kept the books and he dealt with me as he would with you gentlemen. He kept the money and made money for me with it."

In corroboration of her statement that James gave her

money right along she introduced in evidence a savings bank book. This book is entitled "National Exchange Bank In Account With Annie McNelis by J. M. McNelis." It contains only five entries other than the entries showing the credit and withdrawal of semi-annual interest on the deposits. On January 11, 1909, December 31, 1910 and May 31, 1917, deposits of $1,000 each are entered. On July 3, 1911, a withdrawal of $2,040 is entered, and on June 3, 1918, a withdrawal of $1,040.40 is entered, closing the account. She testifies that the amounts withdrawn from this account were loaned by her to C. M. McNelis. In view of James McNelis' means and the relation existing between him and his sister, it is certainly not improbable that between 1917 and 1927 he made other substantial gifts, or payments, of money to this sister.

In the course of her testimony she was shown, and introduced in evidence with her testimony, two notes drawn payable to "Miss Annie McNelis." One for $1,000, payable two years after date with interest at six per cent, is signed by C. M. McNelis. The other for $852, payable twelve months from date with six per cent per annum, is signed by C. M. McNelis and Mary McNelis. She testifies that these notes were given her by C. M. McNelis for money he borrowed from her; that when he died they were in the desk in her home which is hereafter mentioned, and that so far as she knows he paid no interest on them; but that about the time he made the sale to Thurman and Patsel he paid her all that he owed her by turning over to her the $18,000 note here in controversy, and that these two notes were included in that payment. (The deed from C. M. McNelis and wife to Thurman and Patsel is dated April 27, 1929.) Mary Moore's testimony (if it is to be believed) fully corroborates her on these points.

She also testified that C. P. Dorrian bequeathed to her $500. Evidence other than her testimony or that of Mary Moore, shows that C. P. Dorrian died in 1922; that his will was probated in Roanoke city in Will Book 3, page 273, and that C. M. McNelis was the executor of his estate. There

is no evidence in the record which either corroborates or conflicts with her testimony that Dorrian bequeathed her $500; but it was a matter so readily contradicted by evidence of record, that under the setting of this case the failure to contradict her testimony on this point is in reality a corroboration of it.

Mary Moore testified as follows, with reference to the sources from which Annie McNelis' funds came:

"Q. From what source, if you know, did Miss Annie McNelis receive any money or funds?

"A. She received money from her two brothers. She kept house for them for over twenty-five years, and they were devoted to her. Her oldest brother never married and he gave her gifts of money many times. He managed the house and paid all expenses, and her brother Cornelius certainly thought the world of her, and he was very good to her.

"Q. What money she has or has accumulated then has been gifts from her two brothers?

"A. Yes, gifts and in payment for her services for those twenty-five years."

In reply to the question, "Did she [Annie McNelis] receive any money from the estate of J. M. McNelis," she answered "No." Perhaps this categorical answer led the commissioner to make this statement in his report: "The evidence does not disclose that C. M. McNelis was indebted to his sister for anything in connection with the estate of James McNelis, deceased, the only possible debt to her being $1,852 evidenced by two notes, which were found after C. M. McNelis' death, not in her possession, but in his possession * * * that is, in a locked desk to which only he and Mary Moore had a key. * * * that a debt of about $2,000 would be paid by delivering $18,000 is almost inconceivable." But the evidence clearly shows either that Miss Moore did not mean by this answer that Annie McNelis became entitled to no money arising from her interest in James McNelis' estate, or else that she did not know what she was talking about.

It is not possible to say from the evidence above recited

just how much money belonging to Annie McNelis came into the hands of C. M. McNelis prior to May 22, 1929, but it is plain that sums aggregating a very considerable amount did come into his hands for her account. And there is no evidence in the record which shows that any of these sums were ever paid to her by him, unless her statement be true that when he made the sale to Thurman and Patsel he turned over to her the $18,000 note in payment of all that he owed her at that time.

After James McNelis' death Mary Moore assisted him in attending to matters connected with James' estate. She also assisted him to some extent in attending to his personal matters, particularly after his health got bad in the fall of 1930. But it is evident that she assisted him in his own personal business matters only to a very limited extent, and knows little about them, except some things occurring during the last year of his life. After James' death, and perhaps prior to that time, C. M. McNelis kept some of his papers in a locked compartment of a locked desk belonging to Mary Moore at 1715 Patterson avenue. This desk and the locked compartment therein were used both by Mary Moore and by him, and each had keys to the desk and the compartment. But the desk and the compartment therein were primarily hers and he merely shared the use of them with her.

Most of the papers kept in this desk related to James' estate. Most of his personal papers, to which reference is made in the record, were found after his death in his box at the bank, or at his own home. When he died, the $1,000 note and the $500 certificate of deposit here in controversy which are claimed by Mary Moore and James J. Boyle, respectively, and the two notes for $1,000 and $852 payable to Miss Annie McNelis to which we have referred, were found in this desk.

Annie McNelis testified that the $18,000 note claimed by her was also in this desk when he died. But she is probably mistaken about this. Mary Moore testified that after his

death this note was found in his box at the bank, and this is much more probable.

We come now to the evidence relating more specifically to the $18,000 note here in controversy.

C. M. McNelis and his wife executed this note, dated November 22, 1927, and by deed of trust of the same date conveyed to Colonial National Bank, trustee, to secure the payment thereof, a parcel of real estate on Church avenue in Roanoke, which had been owned by C. M. McNelis since 1914. This deed was acknowledged by them on November 23, 1927, but was not recorded until August 30, 1928. By deed dated April 27, 1929, he and his wife conveyed this same property to E. H. Thurman and M. J. Patsel in consideration of $47,000, a part of which was paid by the assumption by them of the payment of the $18,000 note which was secured by the above mentioned deed of trust, $14,000 was paid in cash, and a note for $15,000 was given him for the residue.

Mrs. Mary McNelis testifies that she remembers executing the note and deed of trust, and that her husband told her at the time that he was going to use it to borrow money from the bank to defray expenses against his brother James' estate, but that she does not know what use he made of it then or thereafter.

The evidence is silent as to what was done by C. M. McNelis with the $18,000 note from the time it was executed until about the time he made the sale to Thurman and Patsel. But Mary Moore testifies that *he* never paid any interest on it to any one, and so far as she knows he did not have it up as collateral for a loan, or make any use of it until about the time he made this sale. The back of the note has the appearance of having been written on with a pencil, but if so, the writing has been so completely erased that it is not possible to tell what was written there.

Both Annie McNelis and Mary Moore testified that about the time C. M. McNelis made the sale to Thurman and Patsel he delivered the $18,000 note to Annie McNelis in the presence of Mary Moore, telling her that it was given to

her in settlement of what he owed her at that time. On this subject Mary Moore says: "I saw him hand her the note. I was there." * * * "He told her he was squaring up with her." * * * "He said that he was covering all that he owed her for those twenty-five years."

They also testified that at that time C. M. McNelis owed Miss Annie $18,000. But it is evident from their testimony that while (if their testimony be true) both of them knew that he was indebted to Miss Annie for considerable amounts, neither of them knew or knows of her own knowledge just what amount he owed her; and that their reason for saying that he owed her "18,000," is that he delivered to her this $18,000 note telling her that he was paying her what he owed her.

In his report the commissioner says: "Although Miss Annie McNelis testifies that Miss Moore was present when the note was presented to her, Miss Moore does not testify that she was present or as to what took place or what was said at that time." He must have overlooked the testimony of Mary Moore which we have above quoted.

Mary Moore was called to the witness stand six times. The first time was March 15, 1932, when she was put on by her counsel, who questioned her only with reference to the $1,000 note claimed by her. On cross-examination (?) Mr. Martin, counsel for Mrs. Mary McNelis and Mr. Buford, counsel for the executor, asked her, among others, the following questions about the $18,000 note, to which she replied:

"Q. Do you know who holds the $18,000 note?
"A. Yes, sir.
"Q. Who holds that note?
"A. His sister, Miss Annie McNelis.
"Q. Where did she get the note?
"A. I don't know.
"Q. Do you know how long she has had it?
"A. Since the sale (to Thurman and Patsel).
 * * * * * * * *

"Q. Do you know why that note was turned over to Miss Annie McNelis?

"A. He owed her the money on the note.

"Q. He owed her $18,000?

"A. Yes, sir.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Do you know of your own knowledge that he has borrowed money of Miss Annie McNelis?

"A. Yes, sir.

"Q. Did she have any evidence of the debt?

"A. Of part of it, yes. He handled her affairs and she lent him money at various times.

"Q. And when he sold this property he turned this $18,000 note over to her?

"A. Yes, sir.

"Q. But he has never paid her any interest on the note?

"A. She has been collecting the interest herself.

"Q. Since she got it?

"A. Yes, sir."

On March 24th she was recalled to the witness stand by Mr. Buford and questioned about some other matters, but no question was asked her about the $18,000 note. Annie McNelis was then examined for the first and only time. On March 25th Mary Moore was recalled by counsel for Mrs. Mary McNelis and questioned about the collection of interest on the $18,000 note and some other matters; but she was asked no questions as to whether or not she was present when the note was delivered to Miss Annie or as to where the note was found after C. M. McNelis' death. On April 6th she was recalled by counsel for Annie McNelis (who was also her counsel). At this time she testified that the $18,000 note was found in C. M. McNelis' bank box after his death, and also with reference to the envelope which we shall mention later; but she was asked no question which required a statement as to whether she was present or not when the note was delivered to Miss Annie. It was not until on May 17, 1932, when she was recalled by counsel for Mrs. Mary McNelis that in response to his questions and also

to questions asked her by counsel for Annie McNelis, that she testified she was present and saw C. M. McNelis hand Miss Annie this note, telling her that he was squaring up with her. She was asked why she had at the first hearing answered "I don't know" to the question "Where did she get the note?" Her explanation was that she said this because she was "sore" about the investigation into her personal affairs which was being made and the "talk" that had been going on, and felt that they were going into things that were none of their business.

The commissioner seems to attach much importance to the fact that she did not testify until on May 17th, that she was present or saw C. M. McNelis hand the $18,000 note to Miss Annie. It seems to us that the commissioner has given undue importance to this fact.

Mary Moore's testimony is silent as to what physical disposition was made of this note after she says C. M. McNelis handed it to Annie McNelis, except for the statement that after his death the note was found in his box at the bank. Annie McNelis' testimony as to the physical disposition of this note is contained in the following questions and answers:

"Q. Did he actually turn this note over to you about the time that sale [to Thurman and Patsel] was made?

"A. Yes, sir.

> * * * * * * * *

"Q. Where did you keep this note after he turned it over to you?

"A. It was with all those papers in the desk" [i. e., the desk in her home used by Mary Moore and C. M. McNelis].

"Q. And was the note still there in that desk when your brother died?

"A. Yes, sir.

"Q. Locked up with his other papers?

"A. Yes, sir.

"Q. Was anybody present when he turned the note over to you?

"A. She was [indicating Mary Moore].

\* \* \* \* \* \* \* \*

"Q. Did he [C. M. McNelis] keep it in the desk?

"A. Yes.

"Q. Did you ever see the note?

"A. He just told me that here is your debt for what I owe you.

"Q. Did he tell you the amount of it?

"A. Yes, sir.

\* \* \* \* \* \* \* \*

"Q. You said a while ago he kept the note for you in his desk at the house. Did he keep it or did you keep it?

"A. I kept it.

"Q. Where did you keep it?

"A. In the desk. It was with the other papers. He told me he was paying the debt he owed me."

The commissioner attached much importance to the conflict in the testimony of Annie McNelis and Mary Moore as to where this note was found after C. M. McNelis' death. He in part rests upon it his opinion that their testimony, that C. M. McNelis delivered it to Miss Annie in Mary Moore's presence and told her that he was paying her what he owed her, is not worthy of belief. In view of the relationship that existed between Annie McNelis and her brother and afterwards between her and Mary Moore we attach little importance to this conflict. It may well be that Miss Annie saw her brother put this note in the desk at the time she claims it was delivered to her, and also that the first time she saw it after his death it was then in the desk or was taken from the desk by Mary Moore.

The commissioner attaches so much importance to what occurred with reference to the payment of interest on the $18,000 note on and after May 22, 1929, that we shall examine this evidence at some length.

Both Annie McNelis and Mary Moore testify that from the time C. M. McNelis turned over the $18,000 note to Annie McNelis and including May, 1930, he collected the interest on it for Annie McNelis and either paid it to her or put it in bank for her; and that beginning with November,

1930, Mary Moore collected the interest thereon for Annie McNelis and either deposited in bank to her credit or disposed of it as Annie McNelis directed. But it is patent from their testimony that neither of them knows of their own knowledge what C. M. McNelis did with the three installments of interest he collected on this note.

His own records prove beyond controversy that C. M. McNelis collected and deposited to his checking account at the Colonial National Bank the installments of interest ($540 each) due May and November 22, 1929, and May 22, 1930. It is also shown that he had access to the note at the times these payments were made and noted these three payments on the back of it in his own handwriting. There is no claim made by Annie McNelis that this note was delivered to her until on or about May 22, 1929. The fact that at this time C. M. McNelis collected interest accrued up to that time and appropriated to his own use cannot in any sense be said to be inconsistent with or in conflict with testimony that the note was delivered to her at that time in payment of what McNelis owed her. We may, therefore, dismiss any further consideration of the interest paid May 22, 1929. The entries in his check book show these facts with reference to the November, 1929, and May, 1930, payments: He deposited the November installment ($540) on November 22, 1929; and it was checked out by checks which appear to have been drawn for his own personal use. The $540 installment collected in May 1930, was deposited on May 25, 1930, and was checked out by him on a check for $600 dated May 31, 1930, which is drawn payable to cash, but on the stub of which he has noted "cert." There is no direct evidence to show to whom this certificate was made payable or what was done with it. But at this time C. M. McNelis was acting as the agent of the heirs of his brother James in renting the real estate they inherited from him, and he was also acting as the general agent for his sister Annie in the handling of her affairs. Hylton, the trust officer of the Colonial National Bank, testifies that C. M. McNelis frequently took out certificates of deposit in that

bank payable to himself as agent, and afterwards cashed them and divided up the amount, taking out certificates in the names of the several parties to whom the money belonged.

The record further shows that in October, 1929, C. M. McNelis had obligated himself to pay, and on January 15, 1930, did pay for Annie McNelis to Margaret Nunan $7,400 for her interest in a piece of property which was conveyed to Miss Annie by a deed dated October 8, 1929, recorded November 12, 1929. In return Annie McNelis turned over to C. M. McNelis thirty shares of Colonial National Bank stock, which was transferred to him on December 28, 1929. (See note 8 *ante*.) This stock appears to have had a value of about $200 per share. If this was the price at which this stock was turned over to C. M. McNelis, it failed to pay this $7,400 by $1,400; and it may well be that C. M. McNelis applied the $540 interest collected November 22, 1929, to the repayment to him of this $1,400. There is no evidence which tends to show that it was paid in any way unless it was paid by the application by C. M. McNelis of amounts in his hands due Miss Annie.

The November 22, 1930, installment was collected by Mary Moore and deposited on a certificate of deposit for $540, dated November 25, 1930, payable to Miss Annie McNelis, which is in the evidence and speaks for itself. All that the record shows as to the circumstances under which this was done is that at this time C. M. McNelis was not well, though he was not confined to his home. Several times after this C. M. McNelis balanced his check book (which shows both his checks and deposits) and marked his credit balance as shown thereon "O. K." In view of this fact it can hardly be inferred that he was ignorant of the disposition Mary Moore made of this collection.

On May 22, 1931, C. M. McNelis was confined to his bed at his home, where he died on June 11th. Mary Moore collected this installment of interest and deposited it on a certificate of deposit for $540 payable to Annie Halloran, a niece of Annie McNelis, and held this certificate in her pos-

session until about December 1, 1931. She then deposited it to her (Mary Moore's) checking account, mailed Annie Halloran a check for $500, and deposited $40 on certificate of deposit payable to C. M. McNelis, which $40 certificate she has turned over to his executor.

Mary Moore testifies that Thurman and Patsel left two checks at the Colonial-American National Bank in payment of the May, 1931, interest; that these checks were drawn payable to Miss Annie McNelis, and that C. M. McNelis had directed them to draw the checks that way. There is no evidence which contradicts her testimony on these points. In this connection it is significant that neither Thurman nor Patsel was called as a witness. If her statement that these checks were drawn by them payable to Annie McNelis by the direction of C. M. McNelis is not true, it would seem that it could have been easily refuted by them.

Mrs. Mary McNelis testified that "some time in May," 1930, Mr. Hylton of the Colonial-American National Bank called her husband on the telephone, and when she told him her husband was confined to his bed, told her to tell him that Patsel had brought a check there to put on his account, and that she delivered the message to her husband, who said to her, "that was the interest on the Patsel note." But she does not testify as to what, if anything, her husband said with reference to the disposition to be made of the check, or as to whom the money belonged. After Mary Moore and Mrs. McNelis had given the testimony above mentioned, Hylton was called to the witness stand by counsel for the appellees, but was asked no question with reference to this point.

Mary Moore's explanation of her handling of this interest is that she handled it in accordance with the instructions of her Aunt Annie, who had been asked by Annie Halloran to make her a loan; and that the $40 was placed on certificate to C. M. McNelis at her Aunt Annie's direction, because he had paid a bill for Miss Annie amounting to approximately $40.

The interest installment of November 22, 1931, was also

collected by Mary Moore. When she was first asked as to whom she deposited this collection she said, "It must have been in Miss Annie's name." When questioned further as to whether she had not in fact had the certificate issued payable to herself, she said, "I probably did, I don't remember. It didn't make any difference." When she was recalled some days later she testified that "the interest for the period ending November 22, 1931, was placed in my name. This is also under Aunt Annie's instruction."

It is true as pointed out by the commissioner, that the handling by Mary Moore of the May and November, 1931, interest installments is unusual, and her explanation as to why she handled them in this way is not entirely convincing. But we are not able to concur in the view entertained by the commissioner when he says: "That C. M. McNelis collected and kept at least three installments of interest, May 22, 1929, November 22, 1929, and May 22, 1930, strongly negatives the idea that a gift or payment as claimed took place at that time," i. e., in May, 1922; and that "no explanation is attempted or offered as to why Mr. McNelis collected the interest after the time it is claimed Miss McNelis became the owner of the note." In the light of the whole evidence, we are of opinion that the facts proven with reference to the collection of the interest on this note are more consonant with the possession of and handling of this note by C. M. McNelis as the agent of Annie McNelis than it is with the commissioner's view that he was holding it as his own property and merely made gifts to her of the interest which fell due in November, 1930, and May, 1931.

As has been noted, Mary Moore testified that after C. M. McNelis' death the $18,000 note was not found in the desk, but in his lock box at the bank to which she had access. She does not expressly so state, but the inference is that she found it there, took it out and either gave it to her Aunt Annie or has kept it in her possession as the agent of her Aunt Annie.

There is now written in pencil on the margin of the face of the $18,000 note the words "legal holder" and just under

them "Annie McNelis." These words are written over what appears to be an erasure of something that had been previously written there with a pencil, but the erasure is so complete that nothing can be told about what was erased. Annie McNelis testified that these words are in the handwriting of C. M. McNelis. No other witness was asked any question or gave any testimony on this point. But we have examined the original note and compared it with the large number of specimens of the admittedly genuine handwriting of C. M. McNelis, and find that her testimony on this point is amply corroborated by these specimens. The fact that no other witness was questioned about this writing on the note is strongly indicative that there was no real contention made that these words were not in the handwriting of C. M. McNelis.

Prior to April 6, 1932, Mary Moore had been called to the witness stand three times, each time by counsel for the appellees. On April 6, 1932, she was recalled by counsel representing Annie McNelis. At this time she was shown a long brown manila envelope on the front of which there is the following writing in ink: Near the top in one line is written, *"Receipt for* $18,000 Loan Dated Nov. 22—1927— for 10 years." Just below this in one line is written, *"Placed in Bk. May 22—1929—Legal Holder Annie McNelis."* About the middle of the envelope is written in three lines (1st line) "Deed of Trust on 114 Church," (2nd line) "Payable to Legal holder," (3rd line) "Colonial National Bank Trustee." There is some other writing in pencil on the envelope, but it need not be noticed here, further than to note that one of the pencil notations reads, "Recorded Aug. 1, 1928." This was the first time that any mention had been made of this envelope. She testified positively that all the writing on this envelope was in the handwriting of C. M. McNelis. In reply to a question as to where she found this envelope she said that she could not remember whether she found it in the desk at their home or in C. M. McNelis' bank box. She does not explicitly so state, but the inference seems to be

plain that the $18,000 note was not in this envelope when she found it.

John Dillard, Merle Weaver, and Lena Hall each testified that he or she had worked in the same office with C. M. McNelis for nine years or longer, was familiar with his handwriting, and was positive that all the writing in ink on the envelope was in his handwriting. None of them was asked about the pencil writing.

E. R. West has been a bank clerk for nineteen years and says he has had much experience in examining "signatures." He testified that in his opinion all the words and figures we have italicized are in the handwriting of one person, all the other writing in ink is in that of another, and the several memoranda written in pencil are in the handwriting of a third person. He was not asked whether any of the writing was in the handwriting of C. M. McNelis, and gave no testimony on this point.

L. R. Tucker is an assistant cashier in a bank, has been in the banking business twenty-two years, and says that in his business it has been necessary for him many times "to compare signatures" to see whether they are the same. He testified that in his opinon there was enough similarity in the ink writing on this envelope for it all to have been written by the same person, and that he could not say it was not; but that there are some differences in the writing, and he "believed" that the top line except "receipt for" was written by one person, "receipt for" and the whole second line by another, and the other ink writing by a third person. He was not asked whether any of the writing was in the handwriting of C. M. McNelis, and gave no testimony on that point.

The commissioner makes no finding as to whether either the words on the note "legal holder Annie McNelis," or the ink writing on the envelope are in the handwriting of C. M. McNelis or not. He says, "unless there was a delivery of said note upon which the endorsement appears, I think that the inquiry as to who wrote it of little or no importance;" and then, without passing on the handwriting

finds that there was no delivery of the note. He seems to overlook the fact that the writing on the note and also that on the envelope, if they are in the handwriting of C. M. McNelis, are, under the facts of this case, very material evidence upon the question which he holds decisive of the case, *i. e.*, was the note delivered to Annie McNelis?

We have made a careful, detailed and critical examination of the writing on the note and on this envelope, and have carefully and critically compared the several writings and the several parts thereof with each other and with a large number of what are admitted to be genuine specimens of C. M. McNelis' handwriting. Our judgment is that the great weight of the evidence is that the memorandum on the note and all the writing in ink on the envelope is in the handwriting of C. M. McNelis, but that "receipt for" in the first line on the envelope and all the second line were written with a different pen and apparently at a later time than the other writing. We find in the memorandum on the note and in each line of the writing on the envelope characteristic idiosyncrasies of his admittedly genuine writing, some of which are very marked though not conspicuous. There are some differences in the formation of letters; but in every instance of this to which our attention has been attracted, upon examination we find the same differences frequently occurring in what are admitted to be genuine specimens of his writing, sometimes in two words which were written at the same time.

What weight was given to it by the commissioner cannot be ascertained from his report, but the appellees place much reliance upon a sheet of paper with certain names and figures written on it, which was found somewhere among McNelis' papers after his death. The writings on both sides of this sheet are shown below, arranged as nearly as we can in the relative positions in which they appear on the original:

Side on which Angell-Weaver Realty Corporation letterhead is printed.

"Burrel 20.00
Vincent 18.00
Andrews 8/38.00
Nazibh ‾‾‾‾
Shennas 4.75
Hallmark"
(A word we cannot read)
"8/ Benner

 1/3
 1/3
 1/3"

Reverse side.

| "1 | | 2 | | 3 | 4 | |
|---|---|---|---|---|---|---|
| 45,000 | | 90,000 | | 5/18000 | 1 | 3500 |
| 16,000 | | 16,000 | | ‾‾‾‾‾ | 2 | 4000 |
| 5/29,000 | | 5/75 000 | | 3600 | 3 | 12000 |
| ‾‾‾‾‾ | | ‾‾‾‾‾ | | 2 | | ‾‾‾‾‾ |
| 5 800 | | 15 000 | | ‾‾‾‾‾ | | 19500 |
| 2 | | 2 | | 7200 | | |
| ‾‾‾‾‾ | | ‾‾‾‾‾ | | | | |
| 11,600 | 1 | 30 000 | | | | |
| 30 000 | 2 | | | | | |
| 7 200 | 3 | | | 3/39,780 | | |
| 1 950 | 4 | | | ‾‾‾‾‾ | | |
| ‾‾‾‾‾ | | | | 13,260 | | |
| 50,750 | | | | | | |
| 6,500 | less | | | | | |
| ‾‾‾‾‾ | | | | | | |
| 44 250 | | | | | | |
| 4,470 | less | | | | | |
| ‾‾‾‾‾ | | | | | | |
| 39 780 | net | | | | | |
| 20 000 | alt. | | | | alt | 100 |
| ‾‾‾‾‾ | | | | | | 2 |
| 59 780 | | | | | | ‾‾‾‾‾ |
| 18 000 | note | | | | | 200." |
| ‾‾‾‾‾ | | | | | | |
| 77 780 | | | | | | |

Whoever made these computations seems to have made
the mistake of taking 19,500 from column numbered 4 and

using it as 1,950 in column numbered 1; and also in the subtraction in column 2.

Mary Moore testified that all these names and figures are in C. M. McNelis' handwriting; that he owned two-fifths interest in number 303 Nelson street, which was subject to a $16,000 mortgage and was valued by him at $45,000; that he owned two-fifths interest in 106-8 Church avenue, which was subject to a $16,000 mortgage and was valued by him at $90,000; and that he owned two-fifths interest in a parcel of land at the corner of Norfolk avenue and Nelson street which he valued at about $18,000.

Other evidence in the record shows the following facts which may have a bearing or throw some light on this memorandum. C. M. McNelis acquired one of his two-fifths interests in the corner of Norfolk avenue and Nelson street from his sister Annie by a deed recorded May 12, 1929, and one of his two-fifths interests in the other two parcels by devise from John McNelis, who died in June 1929. When he died he owned four other parcels of real estate: (1) His residence, lots 11, 12 and 13, Grove Park, valued by Commissioner Moomaw at $8,000; (2) lots 26, 27 and 28, section 3, Grove Park, valued by the commissioner at $1,500; (3) an one-half interest in lots 9-16, section 38, Riverview, appraised in 1927 at $1,500; and (4) a lot on Seventh avenue (lot number 30, section 1, Northside Addition), which was conveyed to him by Carter Kyle after January 1, 1930. When Kyle reconveyed this lot to him he held Kyle's purchase money notes, of which those outstanding January 1, 1930, aggregated $3,220 principal. C. M. McNelis' residence was subject to a mortgage for $6,500, which he paid off September 16, 1930. On October 1, 1929, he filed his account as trustee under the will of C. P. Dorrian for M. E. Gildea. This report shows that he then owed this estate $4,476, no part of which seems to have been invested or deposited on a segregated certificate of deposit. In January, 1930, he had acquired the interest of all the other heirs in the Davies and Lewis notes heretofore mentioned, and of these he held when he died notes having a

face value of $8,440, exclusive of accrued interest. When he paid off the $6,500 lien on his residence on September 16, 1930, he deposited to his checking account a certificate of deposit for $4,500 and the proceeds of a loan from the Colonial National Bank for $2,134.65 to make good the check. On September 15, 1930, he deposited $1,120, which he notes in his check book as "Dept. Sept. 15 Angell Note." This note, which was one of the same series of notes as the $1,000 which is claimed by Mary Moore, fell due that day. The evidence indicates that he had held this note for some time prior to August 19, 1930. By December 28, 1929, he had acquired all eighty-five shares of the Colonial-American National Bank stock which he owned when he died, and they had a value of approximately $17,000. He made bequests to Burrell Memorial Hospital, to Bishop Brennan, the pastors of St. Andrews Church and of the Church of Our Lady of Nazareth, and mentions St. Vincent's Orphanage in his will; but he made no bequests to any person, corporation or body which can be identified with the other names on this sheet of paper. His will is dated August 19, 1930.

So far as Mary Moore knows, or as is shown by the record, the $18,000 note here in controversy is the only $18,000 note which C. M. McNelis ever held, or had any connection with.

The appellees contend that this sheet of paper bears internal evidence that it is a memorandum compiled by him at or about the time he wrote his will, and that the addition at the end "18,000 note" constitutes an assertion by him that he owned the $18,000 note here in controversy at the time he made this memorandum.

There is much about it to suggest that it was compiled by McNelis at some time between June 19th and August, 1930, and when he was considering making a will. The fact that he added "18,000 note" at the end of his figures lends color to the conjecture that he did so because he considered himself to be the owner of the $18,000 note. But it does not prove that fact, and is not sufficient to overcome the record he himself made and *left* at his death that Annie McNelis

is the legal holder of this note. When he made it, for what purpose he made it, and what he meant thereby are all conjectural.

In further support of their contention that he considered himself the owner of the $18,000 note and Thurman and Patsel obligated to pay to him the amount thereof, they point to these facts: Mrs. Mary McNelis testified that about a week before he died he told her that she was well taken care of in case he should die and that she was the one who would get the best share. The evidence shows no very material change in the financial condition or the relative amounts of his property invested in real and personal property at the time he wrote his will and when he died. If the claims of the appellants to the $18,000 note, $1,000 note and $500 certificate be good, after the delivery to Mrs. McNelis of the household furniture and to Mary Moore the twenty-five shares of bank stock bequeathed her, and the payment of debts of the estate (including two-fifths of the two $16,-000 mortgages and the undertaker's bill for $2,181.50) there will remain only about $1,699 for the payment of the costs of administration and distribution to the other legatees. The result will be that Mrs. McNelis will receive very little more than a life interest in one-third of his real estate. They argue with some force that when he made his will, McNelis must have thought that he had personal property sufficient to pay all his bequests, including a substantial bequest to his widow, and leave something for his residuary legatees. If, however, as the appellees contend, he made the figures on the sheet of paper above mentioned in connection with a consideration of the making of his will, this last argument is somewhat weakened.

In compiling the figures on that sheet McNelis seems to treat three of the several parcels of real estate as each having a value equal only to its full value less the specific lien thereon. By using these values, and deducting the specific lien on his residence and an amount which seems to be the amount owed by him to the Gildea Trust Fund, he arrives at a result which he divides by three. In devising his real

estate he divided it into three equal parts. This suggests that, perhaps, he may have thought that the devisees of his real estate would take it subject to the specific liens thereon and have to pay off these liens to the exoneration of his personal property. If this were true his personal property would have been amply sufficient to pay all debts and legacies, including approximately $6,000 to his widow, and leave a residue for his residuary legatees. But this, as is all discussion of the meaning of the figures and writing on this sheet of paper, is at best conjecture. It may also be that he did not have in contemplation an undertaker's bill of $2,000 for "casket and services."

The commissioner expresses the opinion that though Mary Moore may not be technically an interested witness within the meaning of section 6209, Code, Virginia 1919, her evidence cannot be regarded as that of an unbiased, impartial and disinterested witness. In this view we concur, but this is not sufficient to stamp her testimony as unworthy of belief. Either she, or other evidence in the record, strongly corroborates every statement made by Annie McNelis, except the single statement as to where the $18,000 note was when McNelis died. The evidence other than the testimony of Annie McNelis and Mary Moore tends strongly to show that in May, 1929, he was indebted to Miss Annie in a substantial amount. The facts that he made the memoranda on the note and on the envelope (which, in our opinion, are in McNelis' handwriting) and that he had not changed them before he died, not only very strongly corroborate their testimony that he delivered this note to Miss Annie as she testifies he did; but it stands as a declaration by him that at the time he wrote these memoranda the note was her property held by him as her agent.

When it is proven that a brother bore the relationship to a sister which is here proven to have existed between C. M. McNelis and his sister Annie, and that when he died there was among the papers in his possession a note not yet due, drawn either by him or by another, payable to the legal holder or to bearer, on which there is writ-

ten in his handwriting a memorandum to the effect that it is the property of his sister, there arises a strong presumption of fact that it is her property, held by him as her agent; and the burden rests upon the executor of the brother's estate, if he contests her right to it, to prove that it was not her property at the time of the brother's death. In our opinion there is evidence in this case which gives rise to such a presumption, and the other evidence is not sufficient to rebut it. On the contrary, we think the weight of the other evidence strengthens it. The court should have decreed that the $18,000 note is the property of Annie McNelis.

Mary Moore was the only witness examined with reference to the $1,000 note which is claimed by her. She testified that the endorsement on the back of it, "Pay to Mary A. Moore C. M. McNelis, bearer," is in the handwriting of C. M. McNelis. We do not understand that anyone questions that this is true, and we accept it as a fact proven.

Her other testimony with reference to this note is fully reflected in the following questions and answers:

Direct examination by her counsel:

"Q. Tell the commissioner who owns that note.

"A. My uncle was the original owner. He left the note in my desk and he told me that the note was mine. It was locked in my desk. He had a key and I had one.

"Q. How did he happen to leave this note in your desk?

"A. My desk was locked, and he had a key to it and I had one.

"Q. Did he, in telling you that this note was in his desk, describe it? Did you find it in there?

"A. I found it in there."

Cross-examination by counsel for appellees:

"Q. You and Mr. C. M. McNelis attended to a lot of the family business together?

"A. We attended to all of the family business.

"Q. Did he keep any of his business papers in your desk?

"A. Practically all of his business papers were kept there.

"Q. It was your desk and his desk too?

"A. We used it together. He would come there to attend to business matters.

"Q. You say this note was locked up in that desk and you found it there after his death?

"A. Yes, sir. I knew it was there before he died.

"Q. Had he ever handed you the note?

"A. He told me it was there and told me it was mine.

"Q. Was it just a gift?

"A. Yes, sir.

"Q. When was that gift made?

"A. I would say about eight months before he died.

"Q. Along in the fall of 1930, as I understand it, Mr. McNelis just told you that this note was there in that compartment he had locked up and that it belonged to you?

"A. Yes, sir.

"Q. It appears this note fell due on September 15, 1931. Why was it not paid then? * * *

"A. I just held the note and asked them to let it go on.

"Q. How much interest did you collect on this note last September?

"A. $60.

"Q. Had interest been paid on the note for the prior two years it had run?

"A. Yes, sir.

"Q. You are sure the Central Manufacturing Company had paid two years' interest prior to that on this note?

"A. I think they had.

"Q. You say you collected interest on this note twice?

"A. No. I only collected it once.

"Q. How much did you collect?

"A. I say $60, that is what is in my mind.

"Q. Did he [McNelis] make any statement to you why he was giving you this note?

"A. No, sir.

"Q. Was there anybody present when he made this statement to you about this being in the desk?

"A. I don't think there were. I don't recollect."

At a subsequent time Miss Moore, recalled by her coun-

sel, testified that she was mistaken about the interest collected by her in September, 1931, being $60; and that she at that time collected $180, the full three years' interest.

The reasons given by the commissioner for holding that the evidence is insufficient to prove a valid gift of this note to Mary Moore are reflected in the following quotations from his opinion filed with his report.

"Code of Virginia, section 6209, requires that the evidence of the claimant against the estate of a decedent be corroborated. * * * I am of the opinion that the evidence of one witness only, and that the claimant, who testifies only as to a verbal declaration of the decedent that a note, previously owned by him, was accompanied by delivery, actual or constructive, that the note belongs, as a gift, to someone else, is not sufficient to establish a valid gift. * * * This endorsement at best, is evidence only of an 'intention to give,' which is not sufficient. While a gift of * * * a chose in action * * * may be made by a written order or assignment, there must be a delivery of the instrument declaring the gift. What has been said about the delivery of the note applies likewise to the delivery of the endorsement thereon. * * * The donor must part not only with the possession, but the dominion of the property. * * * Any contention that the note was in the possession of Miss Moore at the time of and immediately preceding the alleged donor's death is not well founded. The evidence shows clearly that the possession did not change but remained the same after the alleged gift as before. * * * Assuming that the possession of the note be considered in Miss Moore after the time of the verbal declaration of gift by C. M. McNelis * * * it also must be considered that the possession was in her prior to that time. * * * Such facts are not sufficient to constitute a valid gift. There must be a change of possession that is delivery of the thing given or of some written assignment. * * * Another consideration which * * * seems decisive of this matter, is that prior to the time of the alleged gift, such possession as the claimant had was solely for the purpose of safe keeping of the note. This

possession, however, it may be considered, never changed until after the death of C. M. McNelis when the claimant took actual possession."

 This reasoning is, in our opinion, faulty. When A is using a lock box or desk owned and used by B, to which both of them have access, and A takes a note held by him payable to bearer, endorses it payable to B, and places it in or returns it to that lock box, he so far parts with its dominion and possession as to constitute an actual delivery thereof into the possession and dominion of B, unless there be facts and circumstances to show that a delivery thereof to B was not intended. In this case there are no facts and circumstances to show that a delivery to Mary Moore was not intended. On the contrary her testimony is that he told her he had put it there and that it was hers.

The certificate of deposit here in controversy reads in part as follows: "This is to certify that Jas. J. Boyle by C. M. McNelis has deposited in this bank * * * $500 * * * payable to the order of Jas. J. Boyle by C. M. McNelis." The evidence of Mary Moore and James J. Boyle is that C. M. McNelis gave this certificate of deposit to James J. Boyle as a gift in January, 1931. James J. Boyle says that McNelis handed this certificate to him and he gave it to Miss Moore to keep for him. His explanation of why he did this and why the certificate was left in her possession until after McNelis' death is entirely reasonable. Mary Moore says that her uncle handed this certificate to her in James J. Boyle's presence to keep for Boyle, that she put it in the desk used by her and her uncle, and kept it there, and it was there when McNelis died.

 There is no evidence to show that this certificate was in the possession of C. M. McNelis and not in the possession and dominion of Mary Moore at the time of C. M. McNelis' death and for some months before. The most that can be said is that its situation at the time of his death is alone inconclusive as to which of them had possession of it. The certificate itself proves, at least, an intention of the testator to give Boyle this $500. The evidence discloses no

reason why Mary Moore should have testified falsely about this certificate. So far as the record discloses she had nothing to gain by doing so. The certificate itself and her testimony is sufficient, if true, to establish Boyle's right to this certificate, even if all Boyle's testimony be discarded.

While there are some conflicts between the testimony of Mary Moore and James J. Boyle, these conflicts are not sufficient to warrant a finding that either of them is deliberately telling what is not true; and even with these conflicts, the testimony of Mary Moore is, we think, a sufficient corroboration of James J. Boyle's testimony that there was an actual delivery of this certificate.

The decree of the trial court will be reversed, in so far as it relates to the $18,000 note, $1,000 note and $500 certificate of deposit here in controversy, and a decree entered decreeing that the $18,000 note is the property of Annie McNelis, the $1,000 is the property of Mary Moore, and the $500 certificate of deposit is the property of James J. Boyle.

*Reversed.*